RENDERED: JUNE 15, 2017
TO BE PUBLISHED



# Supreme Court of Kentucky

2015-SC-000158-DG

WANDA JEAN THIELE, ET AL      APPELLANTS

ON REVIEW FROM COURT OF APPEALS

V.      CASE NO. 2013-CA-002165-MR

ROCKCASTLE CIRCUIT COURT NO. 11-CI-00329

KENTUCKY GROWERS INSURANCE      APPELLEE
COMPANY

## OPINION OF THE COURT BY JUSTICE CUNNINGHAM

### AFFIRMING

In 2004, Hiram Campbell purchased a homeowner's insurance policy from the Appellee, Kentucky Growers Insurance Company ("Insurer"). The policy provided coverage for Hiram's home located in Brodhead, Kentucky. The policy was self-renewing and continued in effect after Hiram died in late 2005. Following Hiram's death, his daughter, Appellant Wanda Thiele ("Thiele"), moved into Hiram's residence. She was also the executrix of Hiram's estate.

In January 2011, Thiele moved the refrigerator and discovered termite infestation. Additional termite damage was discovered throughout the home, including damage to wall paneling and flooring. Upon discovering the damage,

Thiele contacted Insurer to make a claim under the homeowner's policy provision covering collapse. That provision provides:

> 8. Collapse – "We" pay for direct physical loss . . . involving the collapse of a building or part of a building caused by only the following:
>
> . . .
>
> (b) hidden insect or vermin decay;
>
> Collapse does not mean settling, cracking, bulging, or expanding.

Because no collapse had occurred, Insurer denied Thiele's claim. As a result, Thiele filed a declaration of rights claim in Rockcastle Circuit Court. Insurer answered and filed a motion for a declaratory judgment in its favor. The trial court conducted a hearing and subsequently issued a judgment in Thiele's favor. On appeal, a unanimous Court of Appeals' panel reversed the trial court. Having reviewed the record and the law, we affirm the Court of Appeals' decision and remand this case to the trial court for further proceedings.

## Analysis

"It is well settled that the proper interpretation of insurance contracts generally is a matter of law to be decided by a court; and, thus, an appellate court uses a de novo, not a deferential, standard of review." *Cincinnati Ins. Co. v. Motorists Mut. Ins.*, 306 S.W.3d 69, 73 (Ky. 2010). The controlling case here is *Niagara Fire Ins. Co. v. Curtsinger*, 361 S.W.2d 762, 763 (Ky. 1962). *Curtsinger* defined collapse as follows:

> The word 'collapse' in connection with a building or other structure has a well-understood common meaning. Webster's Collegiate dictionary defines the word as, '(1) To break down or go to pieces suddenly, especially by falling in of sides; to cave in.'
>
> . . .

2

> It seems to us that the mere subsidence of the floor of the porch, which pulled it and the roof away from the building a few inches, cannot be regarded as the collapse of any part of the building, and that the trial court should have so ruled as a matter of law.

*Id.* at 764-65.

The damage to Thiele's residence may have been more extensive than that discussed in *Curtsinger.* However, it is undisputed that Thiele's residence has not "collapsed" under *Curtsinger's* definition. Therefore, applying *Curtsinger* would foreclose recovery under the insurance policy at issue here.

Thiele requests that we abrogate *Curtsinger,* and instead adopt the more lenient majority rule. Under the majority rule, "[t]he structure need not be in imminent danger of collapse, but the damage to it must substantially impair the structural integrity of the building. That is, the damage must alter the basic stability or structure of the building in order to constitute a 'collapse.'" 11 Couch on Insurance, § 153:81 (3d ed., June 2016 Update) (quoting *Sandalwood Condominium Ass'n at Wildwood, Inc. v. Allstate Ins. Co.,* 294 F.Supp.2d 1315, 1318 (M.D. Fla. 2003)). *See also* 71 A.L.R.3d 1072. We decline Appellant's invitation to adopt the majority rule.

We have consistently held that "[t]he words employed in insurance policies, if clear and unambiguous, should be given their plain and ordinary meaning." *Nationwide Mut. Ins. Co. v. Nolan,* 10 S.W.3d 129, 131 (Ky. 1999) (citations omitted). The meaning of "collapse" is clear. Moreover, a significant number of states still adhere to a plain language interpretation of "collapse." *E.g., Heintz v. U.S. Fidelity & Guar. Co.,* 730 S.W.2d 268, 269 (Mo. App. 1987)

3

("There must have been a falling down or collapsing of a part of a building. A condition of impending collapse is insufficient."). Therefore, we believe that *Curtsinger* was rightly decided and see no reason to depart from its holding.

As a practical matter, any long range effect of our decision could easily be minimized by the insurance companies in simply re-defining the "collapse" exemption to meet our judicial definition. We refuse to contort the common sense meaning of that word to the breaking point for such an ephemeral consequence.

## Conclusion

For the foregoing reasons, we hereby affirm the Court of Appeals' decision reversing the trial court's judgment and remanding.

Minton, C.J.; Cunningham, Hughes, Keller, Venters and Wright, JJ., sitting. Minton, C.J.; Hughes, Keller, and Venters, JJ., concur. Wright, J., dissents by separate opinion. VanMeter, J., not sitting.

WRIGHT, J., DISSENTING: I respectfully dissent from the majority's affirming the Court of Appeals' decision reversing the trial court's judgment. I agree with the majority's holding that *Niagara Fire Ins. Co. v. Curtsinger*, 361 S.W.2d 762 (Ky. 1962), is the law in Kentucky. Where I must respectfully dissent from the majority is with its conclusion that "it is undisputed that Thiele's residence has not 'collapsed' under *Curtsinger*'s definition." That is a factual determination for the trial court, and there is substantial evidence to support its finding that a part of the building has collapsed.

4

In *Curtsinger*, our predecessor court adopted Webster's Collegiate Dictionary's definition of collapse: "(1) To break down or go to pieces suddenly . . . ." 361 S.W.2d at 762. There are two parts to this definition. The first is "to break down"; the second, "to go to pieces suddenly." Each describes a separate condition of collapse. Kentucky Growers's analysis of whether collapse has occurred is focused totally on the second, "to go to pieces suddenly." I agree that the facts in this case fail to meet that condition. But there was substantial evidence that parts of the residence had broken down, meeting the first part of the definition of collapse.

The engineering firm's pictures make it clear that it would be impossible for some parts of the residence to collapse due to hidden insect damage because four of the walls are made of concrete block. Photograph 35[1] shows the concrete block walls of the garage and photograph 1 shows that the garage is attached to the house and under the single continuous roof. Photographs 1 and 3 show two chimneys penetrating the roof. Photographs 13 and 19 show that the chimneys are masonry block and would be impervious to termite damage. Photograph 1 also shows that the masonry chimneys, which are attached to and support the single continuous roof, are spaced equally across the side of the building unsupported by masonry walls. The masonry walls and supports would make it impossible, or at least highly unlikely, for this residence to go to pieces suddenly and fall to the ground. If only the second

---

[1] Unless indicated otherwise, all referenced photographs are from Kentucky Growers's Exhibit 3.

5

clause of the definition of collapse counts, then Kentucky Growers would seem to have sold an insurance policy that provides only illusory coverage for insect-damage collapse given the residence's masonry supports.

A closer examination of the evidence makes it clear that there is substantial evidence that parts of this residence had broken down due to hidden insect decay. Kentucky Growers policy provides coverage for:

> 8. Collapse – "We" pay for direct physical loss . . . involving the collapse of a building or part of the building caused by only the following:
>
> . . .
>
> (b) hidden insect or vermin decay . . . .

It is undisputed that there is extensive termite damage to the residence. The question now becomes is there sufficient evidence to show collapse or break down of part of the residence?

Hidden insect decay has caused the floor to drop throughout the residence. Photographs 5, 6, and 13 show that support of the floor has broken down so that the floor has dropped even where it was attached to masonry walls and chimneys. It is impossible to tell from these photographs how much the floor has dropped.

The best evidence of how much parts of this building have broken down and fallen is Photograph 24. It shows that the wall is attached to the roof and adjoining walls and has a steel pipe projecting from the masonry chimney through the wall. The wall has broken down to such degree that the steel pipe has ripped through the wall instead of supporting it. This photograph also shows that the wall and floor have fallen at least 4 inches in spite of being

6

attached to the supporting sidewalls, roof and having the metal pipe sticking through it.

The insurance policy provides coverage if a part of the building collapses due to hidden insect decay. The floors are part of the building. The wall depicted in Photograph 24 is part of the residence. These parts of the residence have broken down as described in the insurance policy.

Termites access their food sources by hidden tunnels and in such manner as to keep them concealed from potential predators. They also eat the wood in such a manner as to keep themselves concealed and the wood standing for as long as possible. This enables the termites to consume as much of the wood as possible before it breaks down and they are exposed to potential predators. The hidden pathways and consumption of the wood that supports this residence is shown by Photographs 7 and 8. The result of this is that by the time the floors and walls have fallen, as happened in Thiele's residence, the termites have destroyed any structural support and it cannot be restabilized.

How does this differ from what occurred in *Curtsinger?* Our predecessor court in *Curtsinger* was faced with a situation where water washed the support out from under a post and so allowed it to drop a short distance before landing on a solid surface and restabilizing. Since the post became supported by another solid surface, it regained its structural integrity and would not fall further. Although the corner of the porch had suffered some damage, it still had structural integrity and was unlikely to fall or break down further. But in

7

our case, parts of the residence have broken down and cannot regain structural support. The parts of the residence that have broken down are being supported by other parts of the building that are impervious to termite damage, but even though they are being supported, they have lost their structural integrity and broken down.

This is best illustrated by the following analogy: if a man were walking down the street, had a heart attack, and fell to the ground, we would consider him to have collapsed; if a man were walking down the street, had a heart attack, and a friend caught him before he hit the ground, we would still consider him to have collapsed. In both examples, the man lost the structural integrity to support himself; but in the second example, the man became supported by a secondary source. In the case before us, the floor and wall in the house have lost their structural integrity and ability to support themselves, but are supported by their attachment to other walls, ceilings, roof, masonry chimneys and metal pipes. The policy covers collapse of a part of the building, and some parts have collapsed even if they have been prevented from reaching the ground by masonry walls, chimneys and metal pipes.

It is important, too, that the insurance policy failed to define collapse. A reasonable person should be able to understand policy provisions and to ascertain what his policy covers without having a legal team research interpretations of its words. Kentucky Growers claims that their position is the normal everyday definition of the word collapse. The simple response to this is that the trial judge and other jurisdictions have come to a different

interpretation than that advanced by Kentucky Growers. Our predecessor court in *Curtsinger* adopted the definition of collapse, but again, that case only utilized the second clause of that definition. As the discussion above shows, the definition's first clause is also very important to the interpretation of this contract. Obviously, it is more complex than the definition advocated by Kentucky Growers, and if there is any ambiguity, it must be interpreted against the drafter of the contract, Kentucky Growers, and in favor of coverage.

Society benefits from contracts—from people fulfilling their promises. First, it forces insurance companies to clearly and unmistakably state what a plan covers and what it does not. Second, it helps to level the playing field so that a reasonably prudent purchaser of insurance will be just as capable of understanding the terms and provisions of a policy. Third, it enables a purchaser of insurance to go to a different company or buy a different policy if they understand that the coverage will not protect them. All this goes a long way in ensuring that consumers get what they bargain for.

Nearly seventy years of precedent of this Court's construction of insurance policies has held that any ambiguity or failure to define terms must be resolved against the drafter of the policy. In 1950, our predecessor Court stated, "[a] policy or contract of insurance ordinarily is to be construed liberally in favor of the insured and strictly as against the insurer." *Koch v. Ocean Acc. & Guar. Corp.*, 230 S.W.2d 893, 895 (Ky. 1950). Likewise, for nearly a half century, this Court has held that "exceptions and exclusions [of insurance policies] should be strictly construed so as to make insurance effective." *State*

*Auto. Mut. Ins. Co. v. Trautwein*, 414 S.W.2d 587, 589 (Ky. 1967). In fact, we have said, "as to the manner of construction of insurance policies, Kentucky law is crystal clear that exclusions are to be narrowly interpreted and all questions resolved in favor of the insured." *Eyler v. Nationwide Mut. Fire Ins. Co.*, 824 S.W.2d 855, 859 (Ky. 1992); *see also Webb v. Ky. Farm Bureau Ins. Co.*, 577 S.W.2d 17 (Ky. App. 1978)). While these long-held tenets of our law are firmly established, I also agree that "[t]he rule of strict construction against an insurance company certainly does not mean that every doubt must be resolved against it . . . [because] the policy must receive a reasonable interpretation consistent . . . [with] the plain meaning and/or language of the contract." *St. Paul Fire & Marine Ins. Co. v. Powell-Walton-Milward, Inc.*, 870 S.W.2d 223, 226 (Ky. 1994).

In *Bidwell v. Shelter Mut. Ins. Co.*, 367 S.W.3d 585, 588 (Ky. 2012), this Court unanimously held:

> To be enforceable, Kentucky law requires a limitation of insurance coverage, such as a permissive user step-down provision, to be 'clearly stated in order to apprise the insured of such limitations.' *St. Paul Fire & Marine Ins. Co. v. Powell–Walton–Milward, Inc.*, 870 S.W.2d 223, 227 (Ky.1994). [N]ot only is the exclusion to be carefully, expressed, but . . . the *operative terms clearly defined. Id.*

(Emphasis added.) Insurance policies are enforceable as long as they "expressly apprise insureds of the exclusion," with the operative terms being clearly defined. Kentucky Growers failed to define collapse in their insurance policy.

10

Just like the exclusion provision in *Bidwell*, Kentucky Growers's policy "leaves the policyholder guessing as to this provision's meaning." 367 S.W.3d at 590-91. "And since the policy is drafted in all details by the insurance company, it must be held strictly accountable for the language used." *Eyler*, 824 S.W.2d at 859-60. Thus, "when ambiguities exist, we resolve them against the drafter 'in order to circumvent the technical, legalistic and complex contractual terms which limit benefits to the insured.'" *Bidwell*, 367 S.W.3d at 588-89 (quoting *Simon v. Cont'l Ins. Co.*, 724 S.W.2d 210, 213 (Ky.1986)).

Under the doctrine of reasonable expectations, the policy must be interpreted in favor of the insured if the policy created a reasonable expectation of coverage. The position advocated by Kentucky Growers would create a situation in which it would almost be impossible for Thiele to have a successful claim. The policy states that it will provide coverage for collapse of a part of the building as a result of hidden termite damage. The way termites work combined with the portions of the building that are impervious to termites would make it impossible for the purchaser to have a successful claim for their damages. As this Court unanimously said:

> An essential tool in deciding whether an insurance policy is ambiguous, and consequently should be interpreted in favor of the insured, is the so-called "doctrine of reasonable expectations." . . . The gist of the doctrine is that the insured is entitled to all the coverage he may reasonably expect to be provided under the policy. Only an unequivocally conspicuous, plain and clear manifestation of the company's intent to exclude coverage will defeat that expectation.

11

*Bidwell,* 367 S.W.3d at 589 (Ky. 2012) (citations and internal quotation marks omitted).

The majority states that "[a]s a practical matter, any long range effect of our decision could easily be minimized by the insurance companies in simply re-defining the 'collapse' exemption to meet our judicial definition." Given the resources and teams of attorneys that are available to the insurance company, this statement is undoubtedly true. In fact, Kentucky Growers changed this policy to specifically exclude this coverage days after receiving the claim. The essential issue is that the purchaser of the insurance should have had the benefit of their bargain. If Thiele was misled by an ambiguity in the policy, then she was denied the ability to shop elsewhere for the coverage. It is also puzzling to understand why Kentucky Growers thought it was necessary to change the policy to clearly exclude coverage for this damage if the policy already unambiguously excluded coverage for this situation.

It is for these reasons that I dissent and would reverse the Court of Appeals.

COUNSEL FOR APPELLANTS:

Robert R. Baker
RANKIN & BAKER, PLLC


COUNSEL FOR APPELLEE:

Don Arlie Pisacano
Elizabeth C. Woodford
MILLER, GRIFFIN & MARKS, P.S.C.


COUNSEL FOR AMICUS CURIAE AMERICAN INSURANCE ASSOCIATION and
INSURANCE INSTITUTE OF KENTUCKY:

Michael Shea Maloney
Stephen Conner Keller
SCHILLER BARNES MALONEY PLLC